# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| SARAH MARTIN, individually and as the surviving mother of decedent CHRISTOPHER RAY BENNETT, | )<br>)<br>)<br>)<br>) |
| and | ) |
| PHILLIP MORRIS, individually and as the surviving father of decedent CHRISTOPHER RAY BENNETT, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) |
| ANNE PRECYTHE, individually, and in her official capacity as Director of Missouri Department of Corrections; | )<br>)<br>)<br>)<br>) |
| CHRISTOPHER SARCHETT, Individually, and his official Capacity as Superintendent of the Transition Center of St. Louis; | )<br>)<br>)<br>)<br>) |
| BRIAN BINGAMAN, individually, and in his official capacity as Correction Officer and Duty Officer at the Transition Center of St. Louis; | )<br>)<br>)<br>)<br>)<br>) |
| CHRISTOPHER GRAPH, individually, and in his official capacity as Correction Officer at the Transition Center of St. Louis; | )<br>)<br>)<br>)<br>)<br>) |
| ZACHARY JENKINS, individually, and in his official capacity as Correction Officer | )<br>)<br>) |

Case No.: 4:23-cv-01037-RHH

| | |
|---|---|
| at the Transition Center of St. Louis; | ) ) ) |
| SHIRLEY TAYLOR, individually, and in her official capacity as Correction Officer at the Transition Center of St. Louis; | ) ) ) ) ) ) ) |
| and | ) ) |
| JOHN/JANE DOES 1-5, in their individual and official capacities with Missouri Department of Corrections, | ) ) ) ) ) |
| Defendants. | ) JURY TRIAL DEMAND |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

1. Christopher Bennett was a detainee housed in the Transition Center of St. Louis, operated by Missouri Department of Corrections, when he died in the early morning hours of March 29, 2023. In obvious and apparent need for medical treatment—which both Mr. Bennett and on-duty medical personnel requested, without avail—Mr. Bennett was left to suffer in a detention cell until he died, suffering seizures, coughing blood, and crying for help for hours. Defendants' failures constitute deliberate indifference and gross negligence in violation of Mr. Bennett's legal rights.

## PARTIES AND VENUE

2. Plaintiff Sarah Martin ("Martin") is a citizen residing in Pettis County in the State of Missouri and Plaintiff Phillip Morris ("Morris") resides in the state of Colorado. (Collectively, "Plaintiffs.")

2

3. Plaintiffs are the surviving parents of Christopher Bennett, and bring this action pursuant to 42 U.S.C. 1983, the Fourteenth Amendment of the United States Constitution, and Missouri statutes governing wrongful death action, sections 537.080 RSMo. 2018, *et. seq*.

4. Mr. Bennett died on March 29, 2023, while in the custody, care and protection of the Missouri Department of Corrections at the Transition Center of St. Louis and while physically on-site at the Transition Center of St. Louis, due to the negligence, deliberate indifference, and/or intentional actions of the named Defendants to this action.

5. Defendants Brian Bingaman, Christopher Sarchett, Wesley Graf, Zachary Jenkins, Shirley Taylor, and John/Jane Does 1-5 were on duty or on call and responsible for supervision of Mr. Bennett's unit the night he was allowed to die. At all times relevant to the subject matter of this litigation, these Defendants were acting under color of state law in their capacity as corrections officers for the Department of Corrections. These Defendants all failed to supervise Mr. Bennett and the facilities where he was being detained to identify obvious medical symptoms showing that Mr. Bennett was in severe distress and, once notified of these symptoms, they failed to take sufficient action to provide him medical care.

6. Defendant Anne Precythe is the Director of the Missouri Department of Corrections and, and in conjunction with her subordinate Defendant Sarchett, Superintendent, bore administrative and managerial responsibility for the Transition Center of St. Louis at all times relevant to this litigation. At all times relevant to this litigation, Precythe and Sarchett were acting under color of state law.

7. John Does 1-5 are unidentified entities, agencies, or natural persons employed by the Missouri Department of Corrections, the Transition Center of St. Louis, and/or Anne Precythe and were involved in the death of Christopher Bennett.

8. Defendants were deliberately indifferent to the conditions of Christopher Bennett's confinement and disregarded known, excessive risks of harm to his safety.

9. Defendants acted together in joint venture, were joint tortfeasors, and are jointly and severally liable to Plaintiffs.

10. All individual defendants are persons under § 1983.

11. Missouri Department of Corrections ("DOC") is a public entity of the State of Missouri, and operates the Transition Center of St. Louis, a subdivision of DOC.

12. Mr. Bennett was in the custody DOC during all times relevant to this Petition in the City of St. Louis, where DOC conducted systemic, continuous, and regular operations.

13. The conduct alleged in this Petition in to have violated Missouri and federal law took place in the City of St. Louis.

14. Venue is therefore proper in the Eastern District of Missouri.

15. Plaintiffs demand a trial by jury on all issues so triable in this case, and under all counts.

## FACTS IN COMMON TO ALL COUNTS

16. Christopher Bennett was a resident at the Transition Center of St. Louis at all relevant times herein.

17. At the time of his death, Mr. Bennett was just 31 years old (dob 12/22/91) and, after his impending release from the Transition Center, looked forward to a long, productive, happy life, including spending time with his sister and three brothers and establishing a career.

18. Mr. Bennett was anticipating parole and a release from custody on May 25, 2023; he indicated to his mother that he was trying to do good time until his release, but that some Corrections Officers at the Transition Center were "not nice"; it seemed to Plaintiff Martin that

4

her son would be able to speak more freely about his treatment at the Transition Center only after his release.

19. Plaintiff Martin was worried about how her son might be being treated at the Transition Center.

20. Defendants were responsible for:

(a.) Oversight, care, and treatment of Mr. Bennett while in the custody of Missouri Department of Corrections;

(b.) Hiring, training, or supervising the employees or agents responsible for the care and treatment of Christopher Bennett;

(c.) Establishment or implementation of appropriate policies, procedures, customs, and practices for subordinate agents and employees and ensuring these policies, procedures, and customs are followed.

21. It is well-established that detainees have a right under the Fourteenth Amendment and under Missouri statutes (including under § 221.120.1 RSMo, which provides, in part, "*If any prisoner confined in the county jail is sick and in the judgment of the jailer, requires the attention of a physician, dental care, or medicine, the jailer shall procure the necessary medicine, dental care, or medical attention necessary to maintain the health of the prisoner…*") to have their serious medical needs attended to, and that correctional facilities have the duty to protect detainees from deliberate indifference to their medical needs.

22. The Eighth Amendment, which prohibits "cruel and unusual punishments," imposes a duty on prison officials to, among other things, ensure that inmates receive adequate food, clothing, shelter, and medical care and to take reasonable measures to guarantee the safety of the inmates.

23. Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the

5

indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under Section 1983. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976).

24. Prison officials have a duty under Missouri law to provide medical care to inmates and may be liable for negligently performing that duty. *See*, *e.g., Davis v. Buchanan Cty. Missouri*, No. 5:17-CV-06058-NKL, 2020 WL 1527164, at *5 (W.D. Mo. Mar. 30, 2020) (survivors of inmate who died after he allegedly received inadequate medical treatment may bring a negligence claim against County Sheriff, the Captain, and Sheriff's deputies).

25.  A reasonable officer would know that it is unlawful to delay medical treatment for a detainee exhibiting obvious signs of medical distress.

26. A reasonable correctional officer would have realized that Mr. Bennett's constitutional rights were violated when his collective symptoms were ignored.

27. The Department of Corrections and its staff, including Defendants, owed a duty to ensure the safety and security of detainees, including the duty to provide or procure adequate medical care to Mr. Bennett.

28. Upon information and belief, under the supervision and management of Defendants Precythe and Sarchett, the Transition Center of St. Louis had adopted indifferent and hazardous practices and/or lack of diligence, constituting deliberate indifference to inmate safety and health; this contributed to the death of Mr. Bennett and also harm or death to other inmates.

29. Precythe and Sarchett's failure to properly supervise and train employees caused a deprivation of Mr. Bennett's constitutional rights; they were deliberately indifferent to or tacitly

authorized the offending acts; they each had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

30. Upon information and belief, corrections officers were not adequately trained or instructed—but should have been—about when to send a detainee to the hospital, how to evaluate the seriousness of acute medical symptoms, or whether or when to inform medical personnel if a detainee vomits or seizes.

31. On March 28, 2023, Mr. Bennett was complaining of illness to staff at the Transition Center, including acute abdominal pain.

32. Mr. Bennett was transported to St. Louis University Hospital for evaluation; physicians were unable to diagnose Mr. Bennett but instructed Transition Center personnel to bring Mr. Bennett back to the hospital if his symptoms persisted or worsened.

33. Mr. Bennett's symptoms would indeed worsen, as described below, but he was not never brought back to the hospital as per medical instructions and per the repeated, desperate requests of Mr. Bennet.

34. After his hospital visit, Mr. Bennett was then transported back to the Transition Center.

35. After arriving back at the Transition Center, Mr. Bennett's symptoms quickly became more acute, and he complained to staff, asking for medical assistance.

36. During the hours leading up to his death, Mr. Bennett vomited or coughed up blood, cried and screamed, had difficultly standing or walking, showed signs of seizure, and otherwise displayed signs of intense and urgent medical distress.

37. The symptoms of seizure, vomiting/coughing blood, difficulty standing or walking, and Mr. Bennett's urgent pleas for help, were facts from which an inference could be easily drawn that Mr. Bennett needed urgent medical help and that his life was otherwise in danger: indeed, it

7

is inevitable based on these glaring facts that Bingaman, Jenkins, Graf, and others who observed or were told of Mr. Bennett's condition *did* in fact reach this inevitable conclusion.

38. Mr. Bennett's observable need for medical attention was such that even a layperson could easily recognize the need for a doctor's attention.

39. Circumstantial evidence may be used to establish a defendant's mental state for a claim of deliberate indifference and "a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the [medical need] was obvious." *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013).

40. The Eighth Circuit has acknowledged that vomiting (especially in combination with other symptoms) may indicate a serious medical need. *See Vaughn v. Gray*, 557 F.3d 904, 909-910 (8th Cir. 2009) (jail guards who knew that inmate had several diagnosed medical conditions, vomited repeatedly over a seven-hour period, and requested medical treatment not entitled to qualified immunity on claim that they were deliberately indifferent to his serious medical needs when they failed to seek any medical treatment for inmate, who later died).

41. The deliberate indifference of on-scene Defendants is strengthened where Mr. Bennett communicated his distress directly and prison officials failed to respond. Id.

42. A nurse was on duty at the Transition Center, who was employed by a third-party agency, believed to be Centurion Health, as well as a mental health nurse employed by Department of Corrections.

43. Upon information and belief, one or both nurses requested that Mr. Bennett be taken back to the hospital, but those requests were refused by officers on duty.

44. A "Code 16" is a medical alert code used at the Transition Center and defined by the Department of Corrections as "A designated radio call for a medical emergency"[1]; Multiple Code 16's were issued in the hours leading to Mr. Bennett's death but were cancelled or overridden by officers on duty or on call.

45. Defendants Graf and Jenkins were shift supervisors on duty in the hours leading up to Mr. Bennett's death and were aware of his critical medical distress and the Code 16's; they should have taken actions to secure Mr. Bennett medical care but failed to do so; to the contrary they, upon information and belief, interfered with such care by keeping other officers out of Mr. Bennett's cell and/or voiding Code 16's.

46. Responding to a Code 16 by providing access to medical care for the afflicted inmate/resident should have been a non-discretionary, ministerial response on the part of officers on duty, in accordance with both policy and legal authority.

47. Responding to the signs of distress and sever illness shown by Mr. Bennett by providing access to medical care for the afflicted inmate/resident should have been a non-discretionary, ministerial response on the part of officers on duty, in accordance with both policy and legal authority.

48. The conduct by Defendants falls neatly into the category of actions which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed; such tasks confer no policymaking authority and require no professional judgment; if an officer hears of a special and urgent medical condition, he or she simply is obligated to respond to it.

---

[1] https://doc.mo.gov/glossary

49. Duty Officer Brian Bingaman had authority to deny medical treatment, and he did so.

50. Defendants Graf and Jenkins

51. At some point in the hours leading up to Mr. Bennett's death, Superintendent Sarchett was contacted about the situation, or an unsuccessful attempt was made to contact him; his lack of response and/or availability constituted a disregard of known inmate safety issues.

52. Mr. Bennett was, sometime before midnight, placed in restraints and was then outrageously locked in an "Ad-Seg" holding cell (which may also be referred to as a TASC room); this cell is intended for punishment/containment of residents who are being disruptive or violent.

53. Mr. Bennett was not being disruptive or violent, he was critically ill, and it was obvious.

54. Mr. Bennett was being punished by officers on duty for being a bother or because they believed he was faking his illness.

55. Mr. Bennett was placed in handcuffs after showing signs of seizure.

56. Personnel on duty were trained in emergency medical techniques, including an Officer who went by the name "Bert," but none of them intervened to assist Mr. Bennett; upon information and belief, another officer named Shirley Taylor—who was supposed to be backing up Bert, as per regulations—was sleeping on duty during this time. Upon information and belief, Bert had demonstrated incompetence during critical training and had to be re-trained.

57. "Bert," despite demonstrated incompetence, was kept in a safety-critical role under the oversight of Defendants Precythe and Sarchett.

58. A "chuckhole" in the cell door should have been left open in order to ventilate the cell and regulate its temperature, and also to allow staff to observe Mr. Bennett's condition; the chuckhole to Mr. Bennett's cell, however, was closed.

59. Mr. Bennett should have been closely monitored and checked at least every 15 minutes but was not closely monitored.

60. Upon information and belief, Mr. Bennett was only checked on once by a nurse between midnight and his death at 3:19 am.

61. Various personnel walked by Mr. Bennett's cell, or were stationed in close proximity to his cell, wholly ignoring his dire plight and refusing his desperate calls for help, including Defendants Bingaman, Graf, and Jenkins.

62. Mr. Bennett had an objectively serious medical need and correctional staff had actual knowledge of it, but they deliberately disregarded such need.

63. The failure to act to save Mr. Bennett by officers on duty, including on the part of Defendant Bingaman, was undertaken willfully, with appreciation and understanding of the risk to Mr. Bennett, and with malice and/or corruption.

64. A minimum level of responsiveness to Mr. Bennett's obvious medical needs would have saved Mr. Bennett's life.

65. The fact that Mr. Bennett was—earlier in the day and before his symptoms intensified— taken to a hospital in no way excuses the outrageous acts and failures to act which followed; to the contrary it highlights that the personnel involved could have easily acted to aid him had they chosen to and they were acting in reckless disregard of a known risk.

66. Mr. Bennet suffered great pain, suffering, and mental and physical anguish and injury prior to death, due to Defendants' outrageous conduct described herein.

67. When Plaintiff Sarah Martin was notified by Department of Corrections about the death of her son via telephone, the representative on the phone was evasive, refusing to answer questions such as whether cameras recorded any events (which indeed they had); the

11

representative speculated that the death may have been the result of overdose and brusquely ended the call, saying, "You'll have to come get his stuff."

68. Plaintiff Martin then faced resistance and difficulty in retrieving her son's personal belongings, and when she finally retrieved them, she found boxes with the incorrect date of death (March 28) written in two separate handwriting scripts.

69. The St. Louis City Medical Examiner found that Mr. Bennett had a clinic history of seizures and had displayed seizure-like activity on video prior to death.

70. The St. Louis City Medical Examiner concluded that the cause of death was "Chronic Seizure Disorder; Epilepsy" and the manner of death was "Natural."

71. Upon information and belief, an electronic system that would have allowed corrections officers to view video relevant to Mr. Bennett's death was disabled for several days following the events described herein, presumably to prevent personnel from viewing the evidence.

72. Plaintiffs have endured tremendous emotional distress and grief due to the actions of Defendants.

73. The conduct described herein violated clearly established federal and state rights (constitutional and statutory) of which every reasonably competent person in Defendants' respective positions would have, or should have, been aware.

74. Christopher Bennett's death is the direct and proximate result of the acts of Defendants.

75. But for the failure of Defendants to respond to Mr. Bennett's medical distress and seek timely aid, Mr. Bennett would still be alive; it is reasonably foreseeable that failing to respond to a detainee in Mr. Bennett's circumstances would result in a preventable death.

76. The actions of the personnel involved were in taken in bad faith and with malice, and constituted a conscious abuse of their powers and duties as corrections officers.

## CLAIMS FOR RELIEF

### Count I – Wrongful Death, § 537.080 RSMo.
*(Against all Defendants)*

77. Plaintiffs hereby re-allege and incorporate by reference the allegations of every Paragraph of this Petition as though fully set forth herein.

78. Plaintiffs are of a class entitled to recover damages for the wrongful death of Christopher Bennett pursuant to § 537.080 RSMo.

79. Defendants owed a duty to Christopher Bennett to provide him with reasonable medical care and to supervise and monitor his physical well-being.

80. Defendants breached this duty of care by failing or refusing to provide Christopher Bennett with appropriate and reasonable medical care.

81. Defendants' refusal to provide appropriate and reasonable medical care is the direct and proximate cause of Christopher Bennett's death.

82. Defendants actions and failures to act in this regard were willful, wanton, malicious, or with complete reckless indifference of conscious disregard for the rights of Christopher Bennett so as to entitle Plaintiffs to punitive or exemplary damages.

83. As a result of the above actions and inactions, Plaintiffs are entitled to damages as are fair and just for the death and suffering of Christopher Bennett, including but not limited to the pecuniary losses suffered by reason of the death, including funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support which would have been provided by Christopher Bennett during the remainder of his expected lifetime.

WHEREFORE, Plaintiffs request this Court enter judgment in their favor against Defendants, jointly and severally, for damages for the wrongful death of Christopher Bennett as are fair and reasonable, for reasonable punitive or exemplary damages in such sum as will serve to punish and deter Defendants and others from future conduct such as that described herein, for their attorney fees and costs herein expended, and for such other and further relief as the Court deems just and proper.

**Count II - 42 U.S.C. § 1983**
**Failure to Provide Medical Care and Treatment/**
**Wrongful Death/**
**Deliberate Indifference**
*(Against all Defendants)*

84. Plaintiffs hereby re-allege and incorporate by reference the allegations of every Paragraph of this Petition as though fully set forth herein.

85. Defendants had a duty under the 8th and 14th Amendments to the Constitution of the United States to provide Christopher Bennett with adequate medical care, but they failed and refused to do so, as Mr. Bennett showed signs of acute physical distress over period of hours and begged for assistance.

86. By refusing to provide Mr. Bennett with proper medical care, Defendants deprived him of his right to medical care and treatment, in violation of 42 U.S.C. § 1983 and the 8th and 14th Amendments to the Constitution of the United States.

87. In doing so, Defendants exhibited a conscious disregard and indifference to Mr. Bennett's obvious and serious medical needs.

88. The denial of access to care and deliberate indifference was the direct and proximate cause of Mr. Bennett's death.

89. Mr. Bennet had an objectively serious and apparent medical need and it was deliberately disregarded.

90. Defendants actions and failures to act in this regard were willful, wanton, malicious, or with complete reckless indifference of conscious disregard for the rights of Christopher Bennett so as to entitle Plaintiffs to punitive or exemplary damages.

91. As a result of the above actions and inactions, Plaintiffs are entitled to damages as are fair and just for the death and suffering of Christopher Bennett, including but not limited to the pecuniary losses suffered by reason of the death, including funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support which would have been provided by Christopher Bennett during the remainder of his expected lifetime.

WHEREFORE, Plaintiffs request this Court enter judgment in her favor against Defendants, jointly and severally, for damages for the wrongful death of Christopher Bennett as are fair and reasonable, for reasonable punitive or exemplary damages in such sum as will serve to punish and deter Defendants and others from future conduct such as that described herein, for their attorney fees and costs herein expended, and for such other and further relief as the Court deems just and proper.

## **Count III- Civil Conspiracy**

*(Against All Defendants)*

92. Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

93. Defendants, acting under color of state law, conspired together and among themselves to deprive Bennett of his constitutional rights and/or to protect one another from liability.

94. Defendants shared the general conspiratorial objective themselves to deprive Bennett of his constitutional rights and/or to protect one another from liability.

95. Defendants furthered the conspiracy by deliberately ignoring Bennett's serious medical need, refusing him treatment, and/or covering up their conduct to avoid its consequences.

96. As a direct and proximate result of Defendants' actions, Bennett was forced to endure severe physical and emotional suffering and was deprived of his life and Plaintiff were deprived of Bennett's valuable companionship, services, support, consortium, and affection.

97. Defendants actions were willful, wanton, malicious, or with complete reckless indifference of conscious disregard for the rights of Christopher Bennett so as to entitle Plaintiffs to punitive or exemplary damages.

WHEREFORE, Plaintiffs request this Court enter judgment in their favor against Defendants, jointly and severally, for damages as are fair and reasonable, for reasonable punitive or exemplary damages in such sum as will serve to punish and deter Defendants and others from future conduct such as that described herein, for their attorney fees and costs herein expended, and for such other and further relief as the Court deems just and proper.

    Respectfully Submitted,

    **/s/ Jeffrey D. Hackney**
    Jeffrey D. Hackney
    Missouri Bar No. 53158
    HKM Employment Attorneys, LLP
    7382 Pershing Ave, Suite 1W
    St. Louis, Missouri 63031
    *Telephone/fax: 314-207-7135*
    *E-Mail: jhackney@hkm.com*
    **Attorney for Plaintiffs**